1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GARRISON T. NAKAYAMA,          )
                              )
              Plaintiff,      )      CASE NO.  C06-1709-MJP-MJB
                              )
       v.                     )
                              )      REPORT AND
MICHAEL J. ASTRUE,            )      RECOMMENDATION
Commissioner of Social Security, )
                              )
              Defendant.      )
_____)

Plaintiff Garrison Nakayama appeals to the District Court from a final decision of the

Commissioner of the Social Security Administration (the "Commissioner") denying his

application for Social Security Disability Insurance benefits under Title II of the Social Security

Act.  For the reasons set forth below, it is recommended that the Commissioner's decision be

AFFIRMED.

I.  PROCEDURAL HISTORY

On August 25, 2003, Plaintiff filed an application for Disability Insurance Benefits

("DIB") alleging disability since January 30, 2002.  Tr. 56-58.  Plaintiff claimed inability to work

due to chronic fatigue syndrome, fibromyalgia, sleep apnea, depression and diabetes.  Tr. 28, 32,

67.  Plaintiff's application was denied initially and on reconsideration.  Tr.26-30, 32-33.  A

hearing was held on May 3, 2006, before Administrative Law Judge ("ALJ") Verrell L. Dethloff.

REPORT AND RECOMMENDATION
Page - 1

1   Tr. 445.  Plaintiff, who was represented by counsel, testified at the hearing.  Tr. 446-461.  On

2   August 3, 2006, the ALJ issued an unfavorable decision finding Plaintiff not disabled within the

3   meaning of the Social Security Act.  Tr. 12-25.  On October 5, 2006, the Appeals Council denied

4   Plaintiff's request for review, making the ALJ's decision the final determination of the

5   Commissioner.  Tr. 2-5.  Plaintiff timely filed his appeal in the United States District Court.

6                              II.  THE PARTIES' POSITIONS

7            Plaintiff argues that the ALJ erred by: 1) failing to properly consider and assess the

8   medical opinions of record; 2) failing to list, evaluate, consider and analyze the severity of

9   Plaintiff's impairments and give the treating physicians' opinions proper weight; 3) not assessing

10  Plaintiff's physical residual functional capacity ("RFC") with regard to his eye impairments and

11  blindness of the right eye, chronic fatigue, gender reassignment, and chronic pain in the 18 tender

12  points of fibromyalgia; 4) finding that Plaintiff was not credible and therefore not disabled; and 5)

13  finding that Plaintiff could return to his past relevant work despite the combination of  his

14  impairments.  The Commissioner requests that his decision be affirmed because the ALJ applied

15  correct legal standards and supported his decision with substantial evidence.

16                             III.  STANDARD OF REVIEW

17           The court may set aside the Commissioner's denial of social security disability benefits

18  when the ALJ's findings are based on legal error or not supported by substantial evidence in the

19  record as a whole.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Substantial evidence is

20  defined as more than a mere scintilla but less than a preponderance; it is such relevant evidence

21  as a reasonable mind might accept as adequate to support a conclusion.  *Magallanes v. Bowen*,

22  881 F.2d 747, 750 (9th Cir. 1989).  The ALJ is responsible for determining credibility, resolving

23  conflicts in medical testimony, and for resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035,

24  1039 (9th Cir. 1995).  Where the evidence is susceptible to more than one rational interpretation,

25

26  REPORT AND RECOMMENDATION
    Page - 2

it is the Commissioner's conclusion which must be upheld.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

## IV.  EVALUATING DISABILITY

The claimant bears the burden of proving that he is disabled.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).

The Social Security regulations set out a five-step sequential evaluation process for determining whether claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must establish that he or she is not engaging in any substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  At step two, the claimant must establish that he or she has one or more medically determinable severe impairments or combination of impairments.  If the claimant does not have a "severe" impairment, he or she is not disabled.  *Id.* at § (c).  At step three, the Commissioner will determine whether the claimant's impairment meets or equals any of the listed impairments described in the regulations.  A claimant who meets one of the listings is disabled.  *See Id.* at § (d).

At step four, if the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, the Commissioner evaluates the claimant's residual functional capacity and the physical and mental demands of the claimant's past relevant work.  *Id.* at § (e).  If the claimant is not able to perform his or her past relevant work, the burden shifts to the Commissioner at step five to show that the claimant can perform some other work that exists in significant numbers in the national economy, taking into consideration the claimant's residual

REPORT AND RECOMMENDATION
Page - 3

1   functional capacity, age, education, and work experience.  *Id.* at § (f); *Tackett v. Apfel*, 180 F.3d

2   1094, 1100 (9th Cir. 1999).  If the Commissioner finds the claimant is unable to perform other

3   work, then the claimant is found disabled.

4   V. SUMMARY OF RECORD EVIDENCE

5        Plaintiff was 64 years old at the time of the hearing.  Tr. 16.  He has a college degree and

6   has completed much of his work towards a doctorate degree.  Tr. 16, 73.  Plaintiff's prior work

7   experience includes work as a band and mathematics teacher for 30 years, an airline reservation

8   agent, sales agent, and travel agent.  Tr. 66, 68.  In his disability report, Plaintiff indicated that he

9   stopped working because he was unable to function at work due to constant body aches and

10  fatigue.  Tr. 68.  Other evidence pertinent to disposition of Plaintiff's claims is incorporated into

11  the discussion below.

12  VI.  THE ALJ'S DECISION

13        At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity

14  since his alleged onset date of disability.  Tr. 16, 24.  At step two, he found that Plaintiff had the

15  following severe impairments: sleep apnea, mild diabetes controlled by diet and medication, and

16  fibromyalgia.  Tr. 19, 24.  At step three, the ALJ determined that Plaintiff's impairments do not

17  meet or medically equal any impairment listed in Appendix 1, Subpart P of the regulations.  *Id.*

18  The ALJ also found that Plaintiff's allegations regarding his limitations are not totally credible.

19  Tr. 23, 24.  At step four, the ALJ found that Plaintiff retains the ability to lift and carry up to 10

20  pounds frequently and up to 20 pounds occasionally; he can sit, stand, and walk for about 6

21  hours in an 8-hour day; and due to some fatigue and pain complaints, he would be limited to no

22  more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, and  working

23  at heights and around hazards.  *Id.*  The ALJ concluded that Plaintiff's RFC would allow him to

24  return to work as a reservation agent as he originally performed that job, and that he likely would

25

26  REPORT AND RECOMMENDATION
    Page - 4

be able to teach as well.  *Id.*  Accordingly, the ALJ found that Plaintiff is "not disabled" within the meaning of the regulations.  *Id.*

## VII.  DISCUSSION

A.    <u>Severe Impairments</u>

Plaintiff claims that the ALJ failed to list most of Plaintiff's impairments and failed to consider the long list of impairments in combination.  (Dkt. #12 at 9).  Specifically, Plaintiff argues that the ALJ failed to properly consider and evaluate the following impairments: fibromyalgia, chronic fatigue syndrome, NIDDM (non-insulin-dependent diabetes mellitus), peripheral neuropathy, diabetes, severe hearing loss: Meniere's Syndrome (severe to profound in the left ear), 20/200 vision in the right eye and 20/40 in the left eye after correction, hyperlipidemia, obstructive sleep apnea, gender identity disorder, dysphoria and depression.  *Id.* In response, the Commissioner argues that Plaintiff did not establish that all of these impairments were severe.  (Dkt. #13 at 3).  The Commissioner contends that the ALJ properly evaluated Plaintiff's severe impairments, and substantial evidence supported the decision that Plaintiff 's severe impairments are limited to sleep apnea, diabetes, and fibromyalgia.  *Id.* at 3, 4.

A claimant's impairment, or combination of impairments, is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a).  Basic work activities are the abilities and aptitudes necessary to do most jobs, including (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  *See* 20 C.F.R. §§ 404.1521, 416.921.  It is important at this step for the ALJ to consider the combined effect of all of the claimant's impairments on his

REPORT AND RECOMMENDATION
Page - 5

or her ability to function, without regard to whether each alone is sufficiently severe.  20 C.F.R. § 404.1523.

To satisfy step two's requirement of a severe impairment, the claimant must prove the physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice.  *See* 20 C.F.R. §§ 404.1508, 416.908.  An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work."  *See* SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).

This court notes that Plaintiff includes fibromyalgia, NIDDM (non-insulin-dependent diabetes mellitus), diabetes, and obstructive sleep apnea on the list of impairments that the ALJ allegedly failed to evaluate.  (*See* Dkt. #12 at 9).  However, these conditions were clearly considered by the ALJ, as evidenced by his findings that Plaintiff has sleep apnea, mild diabetes controlled by diet and medication, and fibromyalgia, and also that the combination of these impairments is "severe" within the meaning of the regulations.  Tr. 19.  As for the other conditions listed in Plaintiff's argument, only hyperlipidemia is not mentioned in the ALJ's decision.  *See* Tr. 17-20.  Therefore, this court first considers whether the ALJ erred by not discussing Plaintiff's hyperlipidemia before addressing whether the ALJ properly evaluated the remaining conditions.

### 1. Hyperlidemia

The record shows that Plaintiff has a history of hyperlipidemia that was treated with the medication Zocor.  *See* Tr. 302, 308, 315, 369, 434.  However, a diagnosis alone cannot satisfy the step two inquiry.  Plaintiff is required to show that his medically determinable impairments are severe.  20 C.F.R. § 404.1520(c).  At the administrative level, Plaintiff did not allege that

REPORT AND RECOMMENDATION
Page - 6

hyperlipidemia was one of his impairments.  (*See* Tr. 67-76, 115-125).  Furthermore, in this

court, he has not pointed to any evidence in the record indicating that hyperlipidemia alone or in

combination with other impairments significantly limited his physical or mental ability to do basic

work activities.  Thus, the undersigned concludes that the ALJ did not err in failing to mention

Plaintiff's hyperlipidemia at step two of the disability evaluation process.

     2.   <u>Chronic Fatigue Syndrome (CFS)</u>

     Although the ALJ acknowledged that Plaintiff has alleged chronic fatigue, the ALJ

determined that "the record shows none of the indicia indicated in SSR 99-2p, which outlines the

criteria for chronic fatigue syndrome."  Tr. 18.  Social Security Ruling (SSR) 99-2p, which

clarifies the Social Security Administration's policies for evaluating cases involving Chronic

Fatigue Syndrome, explains that:

> Under the CDC [Center for Disease Control and Prevention] definition, the
> hallmark of CFS is the presence of clinically evaluated, persistent or relapsing
> chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot
> be explained by another physical or mental disorder, is not the result of ongoing
> exertion, is not substantially alleviated by rest, and results in substantial reduction
> in previous levels of occupational, educational, social, or personal activities.
> Additionally, the current CDC definition of CFS requires the concurrence of 4 or
> more of the following symptoms, all of which must have persisted or recurred
> during 6 or more consecutive months of illness and must not have pre-dated the
> fatigue:
>
> > Self-reported impairment in short-term memory or concentration
> > severe enough to cause substantial reduction in previous levels of
> > occupational, educational, social, or personal activities;
> > Sore throat
> > Tender cervical or axillary lymph nodes;
> > Muscle pain;
> > Multi-joint pain without joint swelling or redness;
> > Headaches of a new type, pattern, or severity;
> > Unrefreshing sleep; and
> > Postexertional malaise lasting more than 24 hours.

SSR 99-2p at *1-2.  The Ruling further explains that under the CDC definition, the diagnosis of

CFS can be made based on an individual's reported symptoms alone *once other possible causes*

REPORT AND RECOMMENDATION
Page - 7

*for the symptoms have been ruled out.* SSR 99-2p at *2 (emphasis added).  However, under the Social Security Act, there must also be medical signs or laboratory findings before the existence of a medically determinable impairment may be established.  *Id.*

Here, as argued by the Commissioner, the record neither shows that other causes for Plaintiff's fatigue have been ruled out, nor does it show that Plaintiff concurrently exhibited at least 4 or more of the symptoms listed above during 6 or more consecutive months.  *See* Tr. 259-293, 317, 320, 428.  In fact, the record shows that in July 2002, a treatment provider from the Chronic Fatigue Clinic at Harborview Medical Center opined that Plaintiff would "have improvement in his insomnia, *fatigue* and pain after his surgery to address the obstructive sleep apnea."  Tr. 285 (emphasis added).  Moreover, other than generally referring to medical records from certain doctors who identified chronic fatigue or fatigue as one of his conditions, Plaintiff makes no argument that those records contain medical signs or laboratory findings of the type described  in SSR 99-2p that would establish his fatigue as a medically determinable impairment under the Act.  *See* SSR 99-2p at *2-4 (listing examples of medical signs or laboratory findings). Accordingly, this court concludes that the ALJ did not err in his assessment of Plaintiff's fatigue.

3.   <u>Peripheral neuropathy, hearing loss, vision loss</u>

The ALJ noted that mild peripheral neuropathy, hearing loss, and eye conditions with retinal detachment were indicated in the record; but he concluded that these conditions "are of no significant medical-vocational consequence, or they have resolved."  Tr. 18.  The ALJ also noted that no examining or treating physician has reported that any of these conditions interfere with Plaintiff's ability to function in an adequate manner.  *Id.*  A careful review of the record shows that the ALJ properly considered the severity of these conditions, and his conclusions are supported by substantial evidence in the record.

First, the medical records show that Plaintiff's peripheral neuropathy was usually listed in

REPORT AND RECOMMENDATION
Page - 8

connection with his diabetes, which was found to be a severe impairment.[1]  Aside from a

February 2005 medical record that listed one of Plaintiff's subjective complaints as "he does have

peripheral neuropathy and is on Neurontin," (Tr. 302), there is no evidence that Plaintiff was

treated for peripheral neuropathy separate from the  treatment provided for his diabetes.

Additionally, the record contains no medical evidence of any limitation on Plaintiff's physical

ability to do basic work activities as result of his peripheral neuropathy.  While Plaintiff testified

that peripheral neuropathy caused tingling and coldness in his hands and feet, and constant

numbness, he also testified that it does not affect his ability to lift, and he is able to write,

although it is harder some days when he feels shaky and unsteady because of his diabetes.  Tr.

456-57.  In light of these facts, the undersigned concludes that the ALJ properly evaluated

Plaintiff's peripheral neuropathy, and the ALJ's conclusion that it is not a severe impairment is

substantially supported by the record evidence.

        Second, regarding Plaintiff's hearing loss, the ALJ noted the following:

>       The claimant wears hearing aids to ampl[if]y his sensorineural hearing loss which
>       is stabilized. (Exhibit 17F, p. 1).  His hearing loss, now at 80 percent in one ear,
>       does not interfere with the claimant's ability to do phone work (testimony).

Tr. 18 (citations in original).  Plaintiff's brief lists his hearing impairment as "severe hearing loss:

Meniere's Syndrom[e] (severe to profound in the left ear)," which is the diagnosis he was given

in May 2004 when he first reported the sudden hearing loss in his left ear.  Tr. 221; *see also* Tr.

219.  However, the record shows there was some improvement in Plaintiff's hearing loss after

three months of treatment, including medication (Diazide) and a low sodium diet.  *See* Tr.  219-

---

[1]From May 2003 to July 2004, medical records from a rheumatology consultant include an assessment that Plaintiff has "NIDDM possibly complicated by peripheral neuropathy."  Tr. 189, 191, 193, 195, 197.  Additionally, medical records in 2003 and 2005 from Plaintiff's treating physician primarily refer to peripheral neuropathy either when describing Plaintiff's subjective complaints (Tr. 295, 302, 315) or when listing his past medical history (Tr. 297, Tr. 302).

REPORT AND RECOMMENDATION
Page - 9

221, 232-33.  In a September 2005 follow up, the medical provider's impression was "stable

sensorineural hearing loss over one year."  Tr. 364.  The provider not only described Plaintiff as

"currently using a hearing aid and complains that he has to adjust it multiple times," but also

noted that he did not have a better protocol for Plaintiff.  *Id.*  The medical records contains no

evidence showing that Plaintiff's hearing loss resulted in any limitations on his ability to do basic

work activities.  Moreover, at the May 2006 administrative hearing, after testifying that he lost

his hearing as a result of his job as a band teacher, Plaintiff acknowledged that he "managed to

work on the phone okay as a reservation agent."  Tr. 449.  Although he stated that it was hard to

deal with the 80 percent hearing loss in his left ear with hearing aids, Plaintiff also testified that

since he stopped working, he mans the phones of a call-in center for four hours weekly.  *Id.*

Overall, these facts substantially support the ALJ's finding that Plaintiff hearing loss in one ear

did not interfere with his ability to do phone work.

Next, the ALJ gave the following evaluation of Plaintiff's vision:

> On May 14, 2003, a retina and vitreous consultant found cataracts and mild
> background diabetic retinopathy with retinal hemorrhages.  However, the
> claimant's central vision was still quite functional.  The claimant elected to have
> eye surgery for removal of cataract, and this was accomplished on November 5,
> 2003 without complications.  No work restrictions were indicated.  (Exhibit 5F).
>
> ***
>
> In January 2005, a retina and macula specialist reported that following a second
> cataract surgery and vitrectomy surgery in October 2004, the claimant's eye
> condition was stabilized with vision measured 20/20 in the right eye and 20/40 in
> left eye with best-correction.  The doctor also indicated that the claimant's
> glaucoma was responding well to topical agents (Exhibit 13F, p.2).  The evidence
> clearly shows that the claimant has no severe visual limitations.

Tr. 17, 18 (citations in original).

The record shows that the ALJ correctly summarized Plaintiff's eye conditions,

surgeries, and post-surgery vision from May 2003 through January 2005.  However, citing Tr.

368 (a record from Virginia Mason Medical Center dated June 1, 2005), Plaintiff lists his eye

REPORT AND RECOMMENDATION
Page - 10

impairment as "20/200 in right eye and 20/40 in left eye after correction." (Dkt. #12 at 9).

While the record cited by Plaintiff shows a change in his right eye vision between January and

June 2005, the ALJ's assessment is consistent with a later record of followup treatment for the

intraocular pressure and glaucoma in Plaintiff's right eye. A record dated December 7, 2005,

lists Plaintiff's visual acuity without correction as 20/400, and as 20/20 when corrected with

contact lens (wearing right contact lens on left eye). Tr. 435. This record also indicates a plan

to continue the prescribed topical agents for Plaintiff's right eye. *Id.* In light of these facts, I

conclude that the ALJ did not err in assessing the severity of Plaintiff's vision impairment.

4.   Gender Identity Disorder

Plaintiff broadly identified dysphoria as one of his impairments, but the medical record

more specifically refers to gender identity dysphoria.[2] Tr. 151, 297, 302, 315, 434.  Gender

identity disorder consists of two components,[3] one of which meets the definition of gender

dysphoria.  Therefore, this court concludes that such dysphoria is encompassed in the ALJ's

assessment of Plaintiff's gender identity disorder.  Here, the ALJ concluded that Plaintiff's

gender identity condition is irrelevant to the disability determination.  Tr. 18.  The ALJ based his

conclusion on the following:

> The claimant has been followed at Virginia Mason Medical Clinic for gender
> reassignment.  A chart note of March 2004 indicates he was receiving hormonal
> therapy with estrogen and progesterone.  At the hearing the claimant stated he has
> worked with his gender identity issue in the past with no relevant limitations
> indicated.

---

[2]The term gender dysphoria denotes strong and persistent feelings of discomfort with one's assigned sex, the desire to possess the body of the other sex, and the desire to be regarded by others as a member of the other sex.  American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders* 535 (4th ed., text revision 2000) (DSM-IV-TR)

[3]*See Id.* at 576 (4th ed., text revision 2000) (DSM-IV-TR) (stating that Gender Identity Disorders are characterized by strong and persistent cross-gender identification accompanied by persistent discomfort with one's assigned sex).

REPORT AND RECOMMENDATION
Page - 11

*Id.* (internal citations omitted).

The record contains substantial evidence showing that Plaintiff was receiving hormone treatment for his gender identity disorder. *See* Tr. 151, 302, 308, 310, 315, 434. Additionally, while Plaintiff did not directly state that he had worked with his gender identity disorder, he did testify about his volunteer activities, which include four hours manning the phones of a call-center once a week; running a trans support group for sexual offenders on McNeil Island once a month; serving on a committee that helps plan a convention; and being the convention schedule presenter (i.e., setting up the program for the conference). Tr. 449-450. He also testified that on some days he would spend two or three hours on the computer for the latter activity. Tr. 450. Because it is implicit in this testimony that Plaintiff performed some basic work activities with his gender identity disorder, *see supra* pp. 5-6 (list of basic work activities), the ALJ's paraphrased reference to this testimony is substantially supported by the record.

It is noted that Plaintiff claims "hormonal therapy, gender reassignment has contributed to his overall emotional impairments," and he proffers his testimony from the hearing as support for this claim.[4] (Dkt. #12 at 10). However, Plaintiff's statement of symptoms alone is not sufficient to satisfy step two's requirement of a severe impairment, and he has not pointed to any medical evidence that supports his assertion. *See* 20 C.F.R. §§ 404.1508, 416.908. In fact, as the Commissioner correctly asserts, Dr. Price, who performed a consultative evaluation of

---

[4]Q:    Is there any other, no, are you having any – I think the file indicated that you have a gender identity disorder? Has, has that caused you any pain at all or problem.
A:    Stress, anxiety. Brought on, I, I, you know, I'm sure the stress. I know the stress exasperates the fibromyalgia, but it's –
Q:    And why, why does that cause you stress?
A:    Just because the public doesn't understand what it is and people's reaction because socially our behavior is not totally acceptable yet. Tr. 459.

Plaintiff on January 14, 2004, stated that Plaintiff "seems to be adjusting to his gender identity disorder and I doubt that it is particularly problematic for him at this time."  Tr. 153. Accordingly, this court concludes that the ALJ did not err in determining that Plaintiff's gender identity disorder was not a severe impairment.

     5.  Depression

The ALJ acknowledged that "the claimant has alleged increasing symptoms of depression," but he concluded that the record does not substantiate that depression or any other mental disorder is severe.  Tr. 19.  In reaching this conclusion, the ALJ relied on the results of a consultative psychiatric evaluation of Plaintiff that was performed by Dr. Richard Price on January 4, 2004, and a DDS assessment that involved consideration of criteria found in section 12 of the regulations in evaluating Plaintiff's psychological limitations.  *See* Tr. 19-20.

The ALJ noted that Dr. Price diagnosed Plaintiff with mild to moderate depression; ruled out pain disorder due to psychological factors and a general medical condition; and gender identity disorder.  However, Dr. Price also opined that Plaintiff would have no psychological work restrictions.  *See* Tr. 20 (citing Ex. 4).  Likewise, the ALJ noted that the DDS assessment indicated that Plaintiff's mental impairment resulted in only a mild degree of functional limitation in the following areas: restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace.  Concluding that the DDS assessment was supported by Dr. Price's opinion that Plaintiff has no psychological limitations that would interfere with basic mental work activities, the ALJ concurred with the DDS assessment in finding that Plaintiff has no severe mental impairment.  Tr. 20.

Review of the medical record reflects that the ALJ accurately summarized the findings and opinions from Dr. Price's mental status examination of Plaintiff (Tr. 150-153) and from the DDS assessment (Tr. 165-178).  Plaintiff has not pointed to any evidence in the record that

REPORT AND RECOMMENDATION
Page - 13

1  contradicts these findings and opinions. This court therefore concludes that the record contains

2  substantial support for the ALJ's finding that Plaintiff's depression is not a severe impairment.

3       Plaintiff further argues that the ALJ did not consider all of his impairments in

4  combination. However, at the outset of his analysis of Plaintiff's severe impairments, the ALJ

5  correctly characterized what the regulations require for determining when a medically

6  determinable impairment or combination of impairments is "severe." *See* Tr. 15 (citing 20 C.F.R.

7  § 404.1520). He likewise acknowledged that the regulations require that if a severe impairment

8  exists, all medically determinable impairments must be considered in the remaining steps of the

9  sequential analysis. *Id.* (citing 20 C.F.R. § 404.1523). Sufficient consideration of the combined

10  effects of a plaintiff's impairments is shown when each is separately discussed in the ALJ's

11  decision, including discussion of the plaintiff's complaints of pain and level of daily activities.

12  *Brown v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992). Here, the ALJ separately discussed each

13  of Plaintiff's alleged impairments before concluding that Plaintiff has sleep apnea, mild diabetes

14  controlled by diet and medication, fibromyalgia, and that *the combination of these impairments*

15  is "severe." Tr. 19 (emphasis added). On this record, the undersigned concludes that the ALJ's

16  analysis and findings indicate that he did consider all of Plaintiff's impairments individually and in

17  combination.

18  B.   <u>Plaintiff's Credibility</u>

19       Plaintiff argues that the ALJ erred by finding him not credible and therefore not disabled.

20  If a claimant has established an underlying impairment which reasonably could be expected to

21  produce the alleged subjective complaints and there is no evidence of malingering, the ALJ must

22  provide clear and convincing reasons for rejecting the claimant's testimony. See *Smolen v.*

23  *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). General findings are insufficient; rather, the ALJ

24  must identify what testimony is not credible and what evidence undermines the claimant's

25

REPORT AND RECOMMENDATION
26  Page - 14

1   complaints.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Varney v. Sec'y of Health and*

2   *Human Servs.*, 846 F.2d 581, 584 (9th Cir. 1988) (Varney I).  In assessing credibility, the ALJ

3   may employ "ordinary techniques of credibility evaluation," considering such factors as:  1) the

4   claimant's reputation for truthfulness, and prior inconsistent statements concerning the

5   symptoms; 2) unexplained or inadequately explained failure to seek treatment or to follow a

6   prescribed course of treatment; 3) the claimant's daily activities; and 4) medical evidence tending

7   to discount the severity of subjective claims.  *See* Smolen, 80 F.3d at 1284; *Light v. Soc. Sec.*

8   *Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citations omitted).

9          In the present case, after summarizing Plaintiff's allegations of inability to work due to

10   pain and fatigue, the ALJ found that Plaintiff's allegations about his limitations were not totally

11   credible.  Tr. 20-21, 24.  The ALJ gave the following reasons for this credibility determination:

12   (1) Plaintiff's significant activities of daily living, (2) the lack of objective findings to support the

13   alleged level of limitations, (3) evidence suggesting a motivation for secondary gain, and (4)

14   questionable consistent compliance with recommended treatment.  Tr. 23.  The ALJ also

15   identified evidence in the record that formed the basis for each reason.  *See* Tr. 21-23.

16          Based only on his subjective allegations of difficulty with his upper body and fine motor

17   manipulation, Plaintiff claims that he could not perform the full range of sedentary work.  (Dkt.

18   #12 at 15-16).  Yet, as argued by the Commissioner, Plaintiff has not assigned error to any of the

19   ALJ's findings in support of his negative credibility determination.  (Dkt. #13 at 10).  Careful

20   review demonstrates that only one of the ALJ's four reasons for discounting Plaintiff's testimony

21   is not substantially supported by the record.

22          In concluding that Plaintiff had questionable consistent compliance with treatment, the

23   ALJ indicated that Plaintiff admitted to a doctor that he did not always test his blood sugars due

24   to "the cost of the strips" and Plaintiff was not getting acupuncture treatment that had been

25

26   REPORT AND RECOMMENDATION
     Page - 15

1    recommended by the doctor for his fibromyalgia.   Tr. 21.  Unexplained or inadequately

2    explained failure to follow a prescribed treatment could  be a legitimate reason for not finding the

3    plaintiff entirely credible.  *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989).  Here, however,

4    treatment notes from September and October 2002 show that Plaintiff indicated he was not

5    getting the acupuncture treatments due to problems with his budget at the time.  *See*  Tr. 281,

6    284.  Likewise, notes from an October 2002 follow up visit at the Chronic Fatigue Clinic indicate

7    that Plaintiff had not been checking his finger stick glucose in the past few months due to

8    numbness in the tip of his fingers. Tr. 281.  Thus, these records show that the ALJ erred in

9    discounting Plaintiff's credibility based on these instances of failure to follow recommended

10   treatments because Plaintiff gave adequate explanations for his non-compliance.

11          However, there is substantial evidence in the record that supports the ALJ's three

12   remaining reasons for the credibility determination.  First, the ALJ's assessment of Plaintiff's

13   daily activity level is consistent with Plaintiff's testimony at the hearing about his weekly and

14   monthly volunteer activities, about his conference scheduling work on the computer for up to

15   three hours on some days, about his travel to Japan and on a Carribean cruise, and about getting

16   out two to four days a week to shop, run errands and drive his mother to and from doctor's

17   appointments. Tr. 449-452.  Second, letters and treatment notes from Plaintiff's medical

18   providers support the ALJ's determination that no treating or examining doctor had restricted

19   Plaintiff from work activity on more than a temporary basis.  *See e.g.,* Tr. 278 (December 2002

20   letter asking that Plaintiff be accommodated to work day shift from 8-5, 5 days a week based on

21   Plaintiff's subjective feeling that his pain increased in the late afternoon); Tr. 288 (treatment

22   notes reflecting  Plaintiff's request for letter for medical leave for 60 days or until he finds day-

23   shift work); Tr. 317 (June 2003 letter from attending physician stating that Plaintiff requested

24   temporary disability status based on his medical conditions, and indicating that the physician

25

26   REPORT AND RECOMMENDATION
     Page - 16

1    would support the request for temporary disability status).

2        Likewise, the ALJ accurately noted that while Plaintiff declined a physical therapy referral

3    in August 2005, claiming that it had not helped him in the past, the record reflects that Plaintiff

4    did show improvement with physical therapy.  *See* Tr. 290, 292, 383.  Additionally, substantial

5    support for the ALJ's interpretation that there was evidence of motivation for secondary gain

6    came from Plaintiff's testimony at the administrative hearing that he had already retired from the

7    teaching profession, he had taken the job as a reservation agent with Alaska Airlines as an

8    intermediary job before Social Security started, and he took leave from that job for as long as he

9    could when it became shift work and he was not allowed to try the day shift.  Tr. 447-449.

10        In light of these facts, this court concludes that the ALJ properly provided clear and

11    convincing reasons for discounting Plaintiff's credibility.

12   C.    Medical Opinions

13        Plaintiff argues that the ALJ erred by giving no weight to the substantial portion of the

14   medical record that details the combination of his impairments and the treatment by doctors at

15   Harborview Clinic (Chronic Fatigue Section) and Virginia Mason Hospital, and by relying on his

16   own medical knowledge in his conclusions.  (Dkt. #12 at 10).  In this argument, Plaintiff

17   specifically refers to medical records from Dr. Dedra Buchwald, Dr. Ellen Schur, Dr. Gurjit

18   Kaeley, and Dr. Curtis Endow.  (*See* Dkt. #12 at 11-12).  Defendant responds that the ALJ

19   properly evaluated the medical evidence.

20        As a general rule, more weight should be given to the opinion of treating and examining

21   doctors than the to opinion of non examining doctors.  *Lester v. Chater*, 81 F.3d 821, 830-31

22   (9th Cir. 1995).  To reject an uncontradicted opinion of a treating or examining doctor, an ALJ

23   must state clear and convincing reasons that are supported by substantial evidence.  *Id*.  If a

24   treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may

25
26   REPORT AND RECOMMENDATION
     Page - 17

1  reject it by providing specific and legitimate reasons that are supported by substantial evidence.

2  *Id.; see also Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995); *Murray v. Heckler*, 722

3  F.2d 499, 502 (9th Cir. 1983).

4  Here, Plaintiff cites blocks of the medical record that he contends show that: (a) Dr.

5  Buchwald saw him for fibromyalgia and chronic fatigue from January 2001 through July 2005

6  (Tr. 259-294); (b) Dr. Schur verified his chronic fatigue, myalgias, and body aches extending

7  down his legs after increased activity (Tr. 259-276); and (c) Dr. Kaeley, who saw him for four

8  follow ups in 2003 and 2004, noted that he was "continuing to have pain over the upper and

9  lower extremities, and his fatigue had worsened" (Tr. 188-200).  According to Plaintiff, the

10  chronic fatigue noted in these records would prevent sustained work.

11  1.  <u>Dr. Buchwald and Dr. Schur</u>

12  Dr. Buchwald and Dr. Schur were among the medical providers who treated Plaintiff at

13  the Chronic Fatigue Clinic at Harborview Medical Center.  The record reflects that Dr.

14  Buchwald saw Plaintiff for follow up twice in 2002.  Tr. 279-282.  Dr. Schur saw Plaintiff for

15  follow up twice 2003, and twice in 2005.  Tr. 250-261, 265-266, 271-273, 276-277.  The ALJ's

16  decision does not specifically refer to either of these doctors; however, it does summarize certain

17  treatment notes from the Chronic Fatigue Clinic during January through December 2002, which

18  would track the dates of Plaintiff's follow ups with Dr. Buchwald.

19  The record shows that when Dr. Buchwald saw Plaintiff in October 2002, she assessed

20  him as having mild obstructive sleep apnea, fibromyalgia that was stable, and Type 2 diabetes

21  mellitus.  Tr. 281-82.  She only mentioned fatigue in listing his problems with sleep apnea, where

22  she noted, "The patient has not been exercising in the past three months due to fatigue."  Tr.

23  281.  When Dr. Buchwald saw Plaintiff in December 2002, she again mentioned fatigue in

24  discussing Plaintiff's sleep apnea, noting that "[h]is fatigue is still the same."  Tr. 279.  At that

25

26  REPORT AND RECOMMENDATION
Page - 18

time, her assessment was that Plaintiff has mild obstructive sleep apnea; fibromyalgia, stable; chronic fatigue, stable; and Type 2 diabetes mellitus.  Tr. 279-280.  Dr. Buchwald also wrote a letter to Plaintiff's employer, Alaska Airlines, indicating that he had been diagnosed with these conditions and that the prognosis of his fibromyalgia and fatigue is unknown.  Tr. 278. However, Dr. Buchwald did not opine that Plaintiff was unable to work.  *Id.*  Instead, based on Plaintiff's feeling that his pain increased in the late afternoon, Dr. Buchwald requested that Plaintiff's position be accommodated to allow him to work the day-shift from 8:00-5:00, 5 days a week, Monday to Friday.  *Id.*

In January 2003, Dr. Schur listed chronic fatigue among her impressions of Plaintiff's condition (Tr. 276); however, she did not include chronic fatigue in later assessments in April 2003 (Tr. 272) and July 2005 (Tr. 259).  Indeed, her only reference to fatigue in the April 2003 follow up was in discussing Plaintiff's history with mild obstructive sleep apnea, where she noted, " He does feel sleepy in the afternoon and he is taking naps one to two hours every day due to fatigue."  Tr. 271.  Likewise, in July 2005, Dr. Schur listed "Fibromyalgia and fatigue" among her impressions of Plaintiff's conditions, noting that she offered him a physical therapy referral, but he was not interested due to prior insufficient relief.  Tr. 260.   None of Dr. Schur's notes contain an opinion on whether Plaintiff's conditions imposed any significant limitations on his ability to work.

Because the ALJ found that Plaintiff's severe impairments are fibromyalgia, sleep apnea, and diabetes, it is clear that the ALJ gave some weight to Dr. Buchwald's and Dr. Schur's opinions, which included these conditions.  However, contrary to Plaintiff's argument, their opinions do not reflect that his fatigue would prevent him from sustained work.

2.    <u>Dr. Kaeley</u>

Dr. Kaeley is a rheumatologist whose initial role was to make sure that Plaintiff did not

REPORT AND RECOMMENDATION
Page - 19

1  have any secondary causes of fibromyalgia.  Tr. 198.  In his brief, Plaintiff points to  notes from

2  follow ups with Dr. Kaeley on 8/11/03, 11/3/03, 1/12/04 and 7/27/04 as support for his claim of

3  disabling chronic fatigue.  (Dkt. #12 at 19, *citing* Tr. 188-200).

4  　　　　While Dr. Kaeley is not mentioned by name, the ALJ did summarize Dr. Kaeley's notes

5  from Plaintiff's follow ups in November 2003 and July 2004.  Tr. 17-18.  Careful review of all

6  Dr. Kaeley's notes show that his only specific reference to "chronic fatigue" was in describing

7  the history of Plaintiff's presenting complaint (fibromyalgia) and in discussing Plaintiff's chart

8  notes from Harborview Medical Center.  *See* Tr. 196, 197.  The November 2003 and July 2004

9  notes reflect Plaintiff's subjective report that his fatigue was worse (Tr. 188, 192), but Dr.

10  Kaeley gave no opinion on whether the fatigue posed any limitations on Plaintiff's ability to

11  work.  Dr. Kaeley's overall assessment was that Plaintiff has: (1) fibromyalgia syndrome with

12  history of sleep apnea - intolerant of CPAP, irritable bowel syndrome and migraine headaches;

13  (2) NIDDM possibly complicated by peripheral neuropathy; and (3) a pigmented rash over the

14  left lateral abdominal area, suspicious for acanthosis nigricans.  Tr. 189, 191, 193, 195.

15  Although not expressly stated, the ALJ appears to have given considerable weight to Dr.

16  Kaeley's opinion because the ALJ included fibromyalgia and diabetes among Plaintiff's severe

17  impairments.  Thus Plaintiff's contention that the ALJ gave no weight to Dr. Kaeley's opinion is

18  without merit.

19  　　　　3.　　Dr. Endow

20  　　　　Plaintiff makes no specific argument regarding Dr. Endow.  Instead, his brief simply sets

21  out the following:

22  　　　　Curtis S. Endow, M.D.:  Dr. Endow is Mr. Nakayama's primary physician and
　　　　treated Mr. Nakayama since 1992 (to present).  In June 2003, Dr. Endow
23  　　　　supported the claimant's disability and separation from Alaska Airlines because of
　　　　Mr. Nakayama's management and treatment of his chronic fatigue syndrome and
24  　　　　fibromyalgia which resulted in physical and emotional effects and sleep
　　　　disturbance.  (Tr. 317).  Dr. Endow notes that he has peripheral neuropathy.  He

25  REPORT AND RECOMMENDATION
26  Page - 20

1   also has tenderness with the weight bearing which is plantar fascitis.  (Tr. 295).
2   His past history is diabetes with the peripheral neuropathy.  His long history with
    gender identity as a non-operative transsexual, depressions, chronic fatigue,
3   fibromyalgia [sic], hearing loss, and peripheral neuropathy, sleep apnea and
    glaucoma.  (Tr. 297).

4   Dkt. #12 at 12).

5          Again, while Dr. Endow is not referred to by name, the ALJ rejected his June 2003

6   opinion letter in support of Plaintiff's request for "temporary disability" status on grounds that

7   this treating doctor provided no functional capacity assessment, the physical examinations were

8   mostly within normal limits, the "temporary disability findings were based on Plaintiff's self-

9   report of afternoon fatigue, and Plaintiff was looking for full-time, day-shift work performing his

10  job as a reservation agent in 2002-2003 after the alleged onset date.  Tr. 21-22.  The ALJ

11  concluded that the record does not support chronic fatigue and pain at a level that supports

12  disability.  Tr. 22.

13         Here, the ALJ has identified specific reasons that are supported by the record, and

14  Plaintiff has neither challenged these reasons nor pointed to any other evidence in the record that

15  refutes the ALJ's assessment of Dr. Endow's opinion.  *See* Tr. 315-320, 322-330, 442-444.  The

16  only physical and mental functional capacity assessments in the record appear to be the ones

17  completed by DDS consultants in May 2004, neither of which conclude that Plaintiff has

18  limitations that would be disabling under the Social Security Act.  Tr. 159-178.  Moreover,

19  opinions of a physician that are premised to a large extent upon the claimant's own accounts of

20  his symptoms and limitations may be disregarded when those complaints have been properly

21  discounted.  *Morgan v. Commissioner of the Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir.

22  1999).  Accordingly, having concluded in section B *supra* that the ALJ properly discounted

23  Plaintiff credibility, this Court further concludes that the ALJ properly rejected Dr. Endow's

24  opinion to the extent that it was based primarily on Plaintiff's subjective report of his symptoms

25
    REPORT AND RECOMMENDATION
26  Page - 21

1    and limitations.

2        D.    Residual Functional Capacity

3        Plaintiff argues that the ALJ erred by not assessing his physical residual functional

4    capacity with regard to his eye impairments and blindness in the right eye, chronic fatigue, gender

5    reassignment, and chronic pain in the tender points of fibromyalgia.  Defendant responds that the

6    ALJ properly considered the medical records and the plaintiff' subjective claims in determining

7    his RFC.

8        A claimant's RFC is based on what he can still do despite his limitations.  *See* 20 C.F.R. §

9    416.945(a)(2001).  At the hearing level, the ALJ evaluates a claimant's RFC at step four of the

10   sequential evaluation process by considering all of the evidence, including any physical and

11   mental limitations.  *See* 20 C.F.R. §§ 416.945(a)(b)(c), 416.946 and SSR 96-8p.  SSR 96-8p

12   provides that "[t]he RFC assessment considers only functional limitations and restrictions that

13   result from an individual's medically determinable impairment or combination of impairments,

14   including the impact of any related symptoms."  SSR 96-8p.  The ALJ is free to accept or reject

15   restrictions that the claimant alleges provided his findings are supported by substantial evidence.

16   *Magallanes*, 881 F.2d at 756-57.

17       In the present case, the ALJ assessed Plaintiff's RFC as follows:

18       Claimant retained the ability to lift and carry up to 10 pounds frequently and up to
         20 pounds occasionally.  He can sit, stand, and walk for about 6 hours in an 8
19       hour day.  Due to some fatigue and pain complaints, the claimant would be
         limited to no more than occasional climbing, balancing, stooping, kneeling,
20       crouching, crawling and working at heights and around hazards.

21   Tr. 23.  In making this RFC assessment, the ALJ noted that he considered all subjective

22   symptoms and any medical opinions which are statements from acceptable medical sources and

23   which reflect judgments about the nature and severity of Plaintiff's impairments and resulting

24   limitations.  Tr. 20.  The ALJ stated that he adopted the findings of the DDS medical consultants

25

26   REPORT AND RECOMMENDATION
     Page - 22

1   who reviewed Plaintiff's physical impairments in May 2004 and determined that Plaintiff would

2   not be precluded from light work activity.  Tr. 23.

3         As discussed in section A above, the ALJ properly evaluated all of Plaintiff's alleged

4   impairments, including his eye conditions, chronic fatigue, and gender identity disorder, and there

5   was no evidence that any of these impairments resulted in any functional limitations for Plaintiff.

6   Careful review of the physical RFC assessment that was completed by the DDS medical

7   consultants reflects that they considered all of Plaintiff's alleged impairment, specifically referring

8   to each impairment.  *See* Tr. 160-161.  Thus, because the record shows that the ALJ utilized the

9   benefit of the DDS consultant's function-by-function assessment, as well as his evaluations of the

10  medical opinion evidence and Plaintiff's testimony as discussed above,  I conclude that the ALJ

11  did not err in assessing Plaintiff's RFC.

12  E.    ALJ's Step Four Determination

13        At step four, claimants have the burden of showing that they can no longer perform their

14  past relevant work.  *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e); *Clem v. Sullivan,* 894 F.2d

15  328, 330 (9th Cir.1990).  Social Security Ruling 82-61 states that a claimant will be found not

16  disabled when it is determined that he or she retains the RFC to perform either the actual

17  functional demands and job duties of a particular past relevant job, or the functional demands and

18  job duties of the occupation as generally required by employers throughout the national

19  economy.

20        Here the ALJ noted that in Plaintiff's former jobs as a teacher and reservations agent, he

21  was not required to perform work activities beyond his current residual functional capacity.  Tr.

22  23.  Therefore, the ALJ determined that Plaintiff would be able to work as a reservation agent, as

23  he originally performed that job, and that he would most likely be able to teach as well.  *Id.*

24        Plaintiff argues that the ALJ erred by finding that he could return to his past relevant

25

26  REPORT AND RECOMMENDATION
    Page - 23

work and by finding that the combination of his impairments do not prevent him from doing so. Plaintiff contends that the ALJ erred in determining that Plaintiff could perform sustained work, and he claims that the physical evaluation performed by Robert Hoskins, M.D., limits Plaintiff's ability to sustain work.  However, Plaintiff has misstated Dr. Hoskins' opinion.  The record shows that Dr. Hoskins affirmed the physical RFC assessment that was completed by the DDS consultant, which opined that Plaintiff is still capable of performing light work, with "precautions for heights and hazards due to alleged fatigue." Tr. 161.  Other than pointing to his list of alleged impairments, which this court has already concluded were properly evaluated by the ALJ, Plaintiff has failed to identify any evidence that demonstrates he is unable to perform his past relevant work.  Therefore, the undersigned concludes that the ALJ did not err because Plaintiff failed to meet his burden at step four.

## VIII.  CONCLUSION

The Commissioner's determination to deny Plaintiff Disability Insurance Benefits is supported by substantial evidence and is free of legal error.  Based on the record evidence, the undersigned recommends that the Commissioner's decision be affirmed.  A proposed Order accompanies this Report and Recommendation.

DATED this 4th day of January, 2008.


_____
MONICA J. BENTON
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 24